NO. 07-03-0096-CR



IN THE COURT OF APPEALS



FOR THE SEVENTH DISTRICT OF TEXAS



AT AMARILLO



PANEL D



MAY 10, 2004


______________________________



ALBERT CARDONA, 



 Appellant


v.



THE STATE OF TEXAS, 



 Appellee

_________________________________



FROM THE 140TH DISTRICT COURT OF LUBBOCK COUNTY;



NO. 2000-433,643; HON. JIM BOB DARNELL, PRESIDING


_______________________________



Opinion


_______________________________



Before QUINN, REAVIS and CAMPBELL, JJ. Appellant Albert Cardona appeals his conviction for manufacturing a controlled
substance. His three issues involve the trial court's denial of his motion to suppress
evidence obtained upon the execution of a search warrant. Purportedly, the warrant was
not supported by probable cause since 1) the informant was not shown to be reliable, 2)
the police investigation used to corroborate the informant's tip did not produce evidence of
an illegal act, and 3) the information given by the informant did not link his observations
to an illegal act. We reverse the judgment of the trial court. 

Background


 The search warrant in question was based on an affidavit executed by Deputy 
Antonio Menchaca. Through it, the police sought authority to search the premises of
Cardona Machine Co., 3610 Ave. A. Allegedly, amphetamine, methamphetamine and
paraphernalia to manufacture, distribute and sell those drugs were located at the site. 

 Within the affidavit, it was alleged that Menchaca and Bruce Lange (a drug
enforcement agent) interviewed, on April 13, 2000, an unnamed source who provided the
following information: 1) he spoke with a hispanic male named Albert Cardona and an
anglo male named J.C. Arnold within the last 72 hours; 2) he had been in the building at
3610 Ave. A within the last 72 hours; 3) he had observed "a large container of anhydrous
amonina [sic] placed on a two-wheel dolly hidden behind a machine press towards the rear
of the building"; 4) he saw a large and small Igloo type cooler "in the Office area of the
business," 5) one cooler "contained numerous baggies"; 6) he saw another cooler by the
"Anhydrous amonina [sic]"; 7) he observed "at least one cardboard box" apparently
containing psuedophed; 8) he saw a "thermos, approximately two quarts in size, in the
Office area" which thermos "had writing on the exterior in permanent type ink which . . .
appeared to be a formula of some type"; and 9) he saw a white canister which he thought
contained starter fluid. Two days later, according to the affiant Menchaca, the source
contacted Lange and said that Cardona and Arnold "[w]ere ready to cook," were in the
process of "obtaining 'lithium batteries' and were then going to cook 'today.'" He also
described the clothing of Cardona and Arnold and the vehicle that "belonged to . . .
Cardona." 

 In the affidavit, Menchaca also described how on April 15th, he and Lange
established surveillance at the 3610 Ave. A location. Furthermore, while they were there
for several hours they 1) saw someone they recognized (from the informant's description)
to be Cardona, 2) saw a car matching the general description given by their tipster, 3) saw
Cardona and Arnold "frequently coming to the large overhead bay type door and the
wooden front door, looking around, looking up and down the street and re-entering the
business" for approximately "one and a half hours," 4) heard a "loud bang" and saw
Cardona "come to the window and front door and look out," 5) saw Arnold and Cardona
leave the building carrying "similar looking black nylon type long rectangular bags with
shoulder straps," 6) noted the bay door had been "secured" while the wooden door was
being "secured" as the two suspects left, 7) saw the two suspects enter the car and drive
away, 8) eventually approached the building (about an hour after Cardona and Arnold left)
whereat Lange "detected the strong chemical odor emanating from the large overhead bay
door," 9) noticed that the bay door was not completely closed and had a garden hose
"extending from under" it, 10) witnessed Arnold and Cardona return to the site "still carrying
the black nylon bags," enter the building, and open the bay door, 11) saw Cardona
"frequently [come] to the door and look[] out, at one point standing in the doorway, reading
a magazine," 12) saw Arnold step from the building wearing "white latex type gloves"
carrying "a jar" appearing to "contain a milky white liquid substance with a clear layer above
it with visible separation between the two," and 13) saw Arnold pour the contents of the jar
onto the ground and watched the contents evaporate "leaving . . . a white in color residue."

 What the white substance consisted of was not described. What caused the "bang"
they heard and whether it came from within or outside the building also went unmentioned. 
Nor did they describe 1) what, if anything, they saw occurring within the building once the
bay doors were opened, 2) the nature of the business conducted by a machine shop, or 3)
how the actions of Arnold and Cardona differed, if any, from the normal operation of a
machine shop. Similarly unmentioned was whether they saw (while conducting their
several hour surveillance) anhydrous ammonia, coolers, baggies, a thermos containing a
formula, starter fluid, or a box containing psuedophed. And, how any of those items, or the
"bang," or the jar with milky white liquid, or the use by Arnold of latex gloves, or Cardona's
reading a magazine in the doorway, or the carrying of black nylon bags by Cardona and
Arnold related to the presence or manufacture of amphetamine, methamphetamine, or
some other contraband also went utterly unmentioned in the affidavit. 

 As for the chemical odor Lange smelled, no one described what it likened to,
whether the manufacture of methamphetamine or amphetamine released a peculiar odor,
whether the odor encountered was akin to that, if any, emanated while manufacturing
methamphetamine, or whether it differed from chemical odors normally encountered in the
operation of a machine shop. In short, whether the smell was somehow related to the
manufacture of methamphetamine, or to solvents or items normally used in a machine
shop, or to decaying food left in a trash can was unmentioned. The affiant also failed to
explain if any of the activity witnessed was unordinary for the operation of a machine shop
or how it related to the manufacture of a controlled substance. 

 As for the statement by the tipster about the Cardona and Arnold being "ready to
cook" or that they "were then going to cook 'today,'" it was made some two days after he
initially spoke with Lange and Menchaca. Moreover, nothing in the affidavit disclosed how
the informant came to know that the suspects allegedly were about to cook. Whether he
had visited Cardona Machine Co. or spoken with Arnold or Cardona and garnered the
information from them or through observing their activity is unknown. Indeed, the affidavit
even fails to state where the tipster told them the cooking was to occur, assuming arguendo
that the tipster even mentioned a place. Similarly unsaid by the affiant is anything about
the tipster confirming that the items seen two days earlier at Cardona Machine Co., 3610
Ave. A were still there or at least unlikely to have been moved. 

 Nonetheless, before closing, the affiant did say:

 [The tipster] knows what Amphetamine/Methamphetamine looks like and is
familiar with the appearance, packaging, handling, use, and method by which
the named controlled substance is introduced into the human body. In
addition the [tipster] is familiar with paraphernalia utilized in the manufacture 

 of Amphetamine/methamphetamine. 


 Affiant believes the [tipster] to be credible and reliable, based on the above
independently corroborated information, provided by the [tipster].


Yet, how the tipster came to have this knowledge, the extent of his knowledge, his prior
interactions, if any, with amphetamine or methamphetamine or its manufacture, his prior
relationship, if any, with Menchaca or Lange, or the reliability of any prior information given
the officers by him goes unmentioned. So too does the affiant fail to explain whether the
tipster informed him that the items or activity he purportedly saw in the machine shop were
related, in any way, to the manufacture or presence of a controlled substance at the locale. 
Indeed, and as previously alluded to, the affiant himself also omits from the affidavit any
statement that explains how the acts of Cardona or Arnold or the presence of any item
alluded to in the affidavit indicated, in any way, that drugs were present or being made at
the site.

Applicable Law


 A search warrant may not issue unless sufficient facts are first presented upon which
a magistrate may conclude that probable cause exists supporting its issuance. Tex. Code
Crim. Proc. Ann. art. 18.01(b) (Vernon Supp. 2004). These facts must be contained in a
"sworn affidavit" accompanying the application for the warrant, id., and illustrate 1) that a
specific offense has been committed, 2) that the specifically described property or items
to be searched for or seized constitute evidence of that offense or evidence that a particular
person committed the offense, and 3) that the property or items in question are located at
or on the particular person, place or thing to be searched. Id. art. 18.01(c). Additionally,
whether the facts in the affidavit are adequate to establish probable cause depends on the
totality of the circumstances. Ramos v. State, 934 S.W.2d 358, 362-63 (Tex. Crim. App.
1996), cert. denied, 520 U.S. 1198, 117 S. Ct. 1556, 137 L.Ed.2d 704 (1997). And, they
establish such cause when the totality of those circumstances justifies a conclusion that the
object of the search is probably on the premises. Id. at 363; Taylor v. State, 54 S.W.3d 21,
24 (Tex. App.-Amarillo 2001, no pet). 

 Yet, one cannot forget that the totality of the circumstances to which we allude must
appear in the affidavit. This is so because the four corners of the affidavit comprise the
field upon which we work. See Cates v. State, 120 S.W.3d 352, 355 n.3 (Tex. Crim. App.
2003) (stating that when a challenge is made "as to whether a search warrant affidavit is
legally sufficient to show probable cause, the trial court is limited to the 'four corners' of the
affidavit"); Jones v. State, 833 S.W.2d 118, 123 (Tex. Crim. App. 1992), cert. denied, 507
U.S. 921, 113 S.Ct. 1285, 122 L.Ed.2d 678 (1993) (stating "[i]t is well settled that, in
determining the sufficiency of an affidavit for an arrest or search warrant, a reviewing court
is limited to the 'four corners of an affidavit'"). Furthermore, while we must read the affidavit
in a common sense, realistic manner and recognize that the magistrate to whom the
affidavit is tendered may draw reasonable inferences from its content, Jones v. State, 833
S.W.2d at 123-24; Carrillo v. State, 98 S.W.3d 789, 791 (Tex. App.--Amarillo 2003, pet.
ref'd), no one can read into the document material information "that does not otherwise
appear on its face." Cassias v. State, 719 S.W.2d 585, 590 (Tex. Crim. App. 1986). And,
though the magistrate's decision is entitled to deference, Carrillo v. State, 98 S.W.3d at
791, we must nonetheless assure that the affidavit provided substantial basis for the
conclusion reached. See Cassias v. State, 719 S.W.2d at 590. In other words, it must
provide a substantial basis to support the magistrate's determination that there existed a
"fair probability that contraband or evidence of a crime [would] be found" at the locale to be
searched. Carrillo v. State, 98 S.W.3d at 791; Taylor v. State, 54 S.W.3d at 24. 

 With the foregoing said, we turn to the circumstances before us and address issue
three first. Upon doing so, we also note the complete absence in the affidavit of any
statement tying the activity of Cardona or Arnold to illegal or suspicious activity. The affiant
merely describes what he and Lange saw and what the tipster told him. Yet, no one
indicated that the acts were like those undertaken by individuals engaged in any type of
criminal activity. Nor was the magistrate even told that what the affiant perceived was
unordinary or unusual conduct by those operating a machine shop or business utilizing
machinery or a "machine press." And, like many other things omitted by the affiant, no one
explained the relationship between the anhydrous ammonia, psuedophed, baggies,
coolers, thermos, milky white substance poured from a jar, "bang," latex gloves, and black
nylon bags to the presence of methamphetamine, amphetamine, their manufacture or to
any other type of potential criminal activity. These omissions are pivotal for the affidavit
must illustrate not only that a specific offense has been committed but also that the
specifically described property or items to be searched for or seized constitute evidence
of that offense or evidence that a particular person committed the offense. Tex. Code
Crim. Proc. Ann. art. 18.01(b) (Vernon Supp. 2004). Here, this court, the trial court and
the judge who issued the warrant were left to guess at the nexus, if any, between the
matter described in the affidavit and criminal activity.

 Nor can one reasonably infer that because the tipster purportedly knew what
methamphetamine was and was familiar with the paraphernalia used in its manufacture
then the items of and matter about which he informed Menchaca and Lange constituted
such paraphernalia or criminal activity. A simple example proves the fallacy of such an
inference. An informant coupling a description of his experience with the manufacture of
methamphetamine to a statement that he not only saw ten pounds of flour in a case hidden
in a corner, three quarts of milk in a thermos containing some script, five pounds of
chocolate chips, two pounds of butter in a cooler, and a case of pecans placed behind a
portable oven and but also heard certain individuals say there were about to cook hardly
makes the ingredients for grandma's chocolate chip cookies the contents of
methamphetamine. Without someone familiar with the process of manufacturing the drug
stating that the items seen or conduct perceived were somehow related to that process,
any attempt to conclude that the items and conduct seen must relate to the drug or its
manufacture is conjecture. 

 Nor do we accept the State's postulation that the affidavit was sufficient because "it
is common knowledge what items are most often utilized in the manufacture of
methamphetamine." Common knowledge consists of matter "so well known to the
community as to be beyond dispute." Ritz Car Wash, Inc. v. Kastis, 976 S.W.2d 812, 814
(Tex. App.-Houston [1st Dist.] 1998, pet. denied). The formula for or ingredients of
methamphetamine and amphetamine or the process by which either is made hardly falls
within that category, and we rue the day it does. That same may also be found on the
internet, according to the State, does not somehow elevate it to that status either. Indeed,
having to investigate the annals of electronic data to discover particular information itself
suggests that the subjects being researched are far from common knowledge. Moreover,
if the presence of information on the worldwide web were alone the test for labeling matter
common knowledge, then most everything would be such for most anything can be found
there if the researcher is sufficiently patient and persistent. Indeed, one can also find on
the internet information about the Superstring Theory and the manner in which it resolves
the mathematical incompatibility of the foundational pillars of quantum mechanics and the
General Theory of Relativity. Yet, that is no reason to conclude that the Superstring Theory
is now part of the everyday, incontestable knowledge of the community. So, mere
presence on the internet is far from determinative of how well-known a particular subject
is. 

 Nor can the specialized knowledge of a particular magistrate or affiant be imputed
into the affidavit. Again, the rule of law prohibits us from perusing anything other than the
four corners of the document. Any specialized information lying within the mind of a police
officer or jurist and garnered through the years falls outside that realm. As said in Cassias,
"[i]t is one thing to draw reasonable inferences from information clearly set forth within the
four corners of an affidavit . . . [and] quite another . . . to read material information into an
affidavit that does not otherwise appear on its face." Cassias v. State, 719 S.W.2d at 590. 
 So too do we reject the State's suggestion on appeal that it "is a reasonable
inference based upon the hidden location of the anhydrous ammonia within a machine
shop that the . . . ammonia was illicitly acquired and was improperly stored in a receptacle
not designed for the storage" of same. (1) Immediately noticeable is the absence of any
explanation regarding how one can logically jump from the proposition that something is
hidden to the conclusion that it must be contraband. Parents hide presents from their
children; that does not mean the presents were obtained unlawfully or that the presents
consist of contraband. Hiding something may permit one to infer that someone does not
want the item to be easily found. Yet, it does not alone reasonably permit one to infer that
the object being hidden is somehow tied to criminal activity. To surmise otherwise would
be to again delve into conjecture, and that we cannot do. 

 Appellant's third issue is meritorious. Thus, we conclude that the affidavit did not
provide substantial basis for the conclusion that a specific offense had been committed,
and hold that the trial court erred in failing to grant the motion to suppress. So too do we
find that the error was harmful since the evidence obtained upon execution of the defective
warrant provided the basis for appellant's conviction. And, since appellant's other criticisms
of the affidavit need not be addressed at this time, we reverse the judgment and remand
the cause to the trial court. 


 Brian Quinn

 Justice


Publish.
1. We assume arguendo that the ammonia was hidden. In doing so, we also note that Menchaca failed
to explain how his tipster arrived at that conclusory observation. Also worthy of note is the line of authority
holding that conclusions appearing in an affidavit carry little weight. Cassias v. State, 719 S.W.2d 585, 588
(Tex. Crim. App. 1986) (stating that conclusory utterances "establish little if anything").